NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**OLAPLEX, INC.,**
*Plaintiff-Cross-Appellant*

v.

**L'ORÉAL USA, INC., L'ORÉAL USA PRODUCTS, INC., L'ORÉAL USA S/D, INC., REDKEN 5TH AVENUE NYC, L.L.C.,**
*Defendants-Appellants*

---

2020-1382, 2020-1422, 2020-1689, 2020-1690

---

Appeals from the United States District Court for the District of Delaware in No. 1:17-cv-00014-JFB-SRF, Senior Judge Joseph F. Bataillon.

---

Decided:  May 6, 2021

---

SANFORD IAN WEISBURST, Quinn Emanuel Urquhart & Sullivan, LLP, New York, NY, argued for plaintiff-cross-appellant.  Also represented by JOSEPH M. PAUNOVICH, Los Angeles, CA.

STEPHEN BLAKE KINNAIRD, Paul Hastings LLP, Washington, DC, argued for defendants-appellants.  Also represented by NAVEEN MODI, JOSEPH PALYS, IGOR VICTOR

TIMOFEYEV, DANIEL ZEILBERGER; KATHERINE FRENCK MURRAY, Browne George Ross O'Brien Annaguey & Ellis LLP, Los Angeles, CA.

————————————————

Before DYK, REYNA, and TARANTO, *Circuit Judges.*

TARANTO, *Circuit Judge.*

This appeal is from a judgment in favor of plaintiffs Liqwd, Inc. and Olaplex LLC against L'Oréal USA, Inc., L'Oréal USA Products, Inc., L'Oréal USA S/D, Inc., and Redken 5th Avenue NYC, LLC (collectively, L'Oréal). The causes of action at issue are for (1) infringement of claims 1 and 10 of U.S. Patent No. 9,498,419 and claims 1, 4, 11–16, 19, 20, and 30 of U.S. Patent No. 9,668,954, and (2) misappropriation of several trade secrets and breach of a non-disclosure agreement. A determination of patent infringement was made by the district court on summary judgment, and a jury then found for plaintiffs on patent-validity issues and on the two non-patent causes of action and awarded damages. L'Oréal appeals on various grounds from the liability and damages determinations. Plaintiffs (Olaplex, a term that also includes Olaplex, Inc., substituted by this opinion) cross-appeal regarding the amount of damages.

With respect to the patent-infringement component of the case, prior decisions of this court and of the Patent Trial and Appeal Board leave little in dispute here. Our court has addressed aspects of the patent dispute between these parties on multiple occasions. *See Olaplex, Inc. v. L'Oréal USA, Inc.*, Nos. 2019-2280 & 2019-2292, 2021 WL 831031 (Fed. Cir. Mar. 4, 2021) (*Injunction Appeal*) (holding that summary judgment of infringement in this case was error and vacating permanent injunction); *L'Oréal USA, Inc. v. Olaplex, Inc.*, Nos. 2019-2410 & 2020-1014, 2021 WL 280493 (Fed. Cir. Jan. 28, 2021) (*'954 Appeal*) (affirming Board's rejection of patentability challenge to claims 14–16

of the '954 patent and Board's determination of unpatentability of all other claims of the '954 patent asserted in this case); *Liqwd, Inc. v. L'Oréal USA, Inc.*, 720 F. App'x 623 (Fed. Cir. 2018) (appeal of preliminary injunction); *Liqwd, Inc. v. L'Oréal USA, Inc.*, 941 F.3d 1133 (Fed. Cir. 2019) (*'419 Appeal*) (appeal involving Board review of the '419 patent, affirming in part and remanding for reconsideration of unpatentability of the relevant claims of the '419 patent); Order at 2, *Liqwd, Inc. v. L'Oréal USA, Inc.*, No. 19-2280, ECF No. 15 (Fed. Cir. Aug. 21, 2019) (partial stay of now-vacated permanent injunction). Moreover, on remand from the *'419 Appeal*, the Board held the relevant claims of the '419 patent unpatentable, *L'Oréal USA, Inc. v. Liqwd, Inc.*, No. PGR2017-00012, Paper 119 (P.T.A.B. Dec. 9, 2020), and Olaplex eventually dropped its appeal from that ruling, *see* Order, *Olaplex, Inc. v. L'Oréal USA, Inc.*, No. 2021-1512, ECF No. 11 (Fed. Cir. Feb. 8, 2021). The unpatentability rulings reduce the surviving patent claims asserted here to the '954 patent's claims 14–16. In addition, the *Injunction Appeal* ruling reversed the district court's grant of summary judgment of infringement in this case, holding that there were triable issues of fact. Those rulings substantially narrow what remains disputed about the patent component of this case.

We reverse in part, affirm in part, vacate in part, dismiss in part, and remand. In particular, we reverse the judgment of liability for trade-secret misappropriation and breach of contract, and we vacate the infringement judgment and remand for a trial on patent infringement and damages limited to claims 14–16 of the '954 patent. We dismiss plaintiffs' conditional cross-appeal as moot given our rejection of non-patent liability.

I

After the district court granted summary judgment of infringement, the parties presented their case to a jury starting on August 5, 2019. Olaplex presented evidence to

support its trade-secret and breach-of-contract claims and evidence on damages for those claims and for patent infringement. L'Oréal asserted, as relevant here, an affirmative defense of invalidity of claims 14–16 of the '954 patent based on the nonobviousness and written-description requirements of 35 U.S.C. §§ 103 and 112.

On August 12, 2019, the jury returned a verdict for plaintiffs. On the trade-secret claim, the jury found that, "on May 19, 2015, [Olaplex] possessed specific, identifiable Trade Secret(s)," that L'Oréal "misappropriated Olaplex's trade secret information," causing damages in the amount of $22,265,000, and that L'Oréal's misappropriation was "willful or malicious." J.A. 37623–24. On Olaplex's breach-of-contract claim, which Olaplex recognizes to be indistinguishable from its trade-secret claim at this point, the jury found that L'Oréal breached the "May 2015 Non-Disclosure Agreement[]," causing damages in the amount of $22,265,000. J.A. 37625. On L'Oréal's affirmative defense of patent invalidity, the jury found, as relevant here, that L'Oréal did not prove invalidity of claims 14–16 of the '954 patent. J.A. 37625. On patent damages, the jury awarded damages of $24,960,00 against L'Oréal for infringing the '954 patent. J.A. 37627. The jury also found that Olaplex proved that L'Oréal's patent infringement was willful. J.A. 37627.

On August 20, 2019, the district court issued a "Memorandum and Judgment," adjusting the jury's damages award to avoid inconsistencies and to prevent double recovery. J.A. 37682–86. Specifically, the district court reduced the non-patent damages to reflect its view of when such damages had to end given when the protected information became publicly available. J.A. 37683–85. It also set an amount for exemplary damages and approved an award of attorney's fees and costs. J.A. 37683–85. The total damages amount entered was $49,920,000, not including attorney's fees, court costs, or interest on the damages award. J.A. 37686 & n.1.

L'Oréal then renewed its motion for judgment as a matter of law (JMOL) and moved for a new trial. Olaplex, for its part, sought prejudgment interest on the damages award and attorney's fees, among other things. On December 16, 2019, the district court issued a memorandum and order resolving the parties' post-trial motions. *See Liqwd, Inc. v. L'Oréal USA, Inc.*, No. 1:17-cv-00014, 2019 WL 6840353 (D. Del. Dec. 16, 2019) (*December 2019 Decision*). The district court denied L'Oréal's JMOL and new-trial motions. *Id.* at \*5, \*8–9, \*14–15. The court granted Olaplex's motion for prejudgment interest on the damages award but denied it as to attorney's fees. *Id.* at \*2–8, \*10–14.

On January 15, 2020, L'Oréal timely filed a notice of appeal "in an abundance of caution" and "as a protective measure to ensure appellate jurisdiction." J.A. 42236. Two weeks later, Olaplex timely filed a notice of cross-appeal. On March 24, 2020, the district court entered final judgment on a separate document. J.A. 22–24. The court ordered L'Oréal to pay $66,167,843, which included attorney's fees, costs, and prejudgment interest, and to pay post-judgment interest "at the statutory interest rate pursuant to 28 U.S.C. § 1961 in the amount of $2,813.49 per day beginning the day this Final Judgment is entered and ending the day upon which Defendants fully satisfy this Final Judgement." J.A. 23–24.

Soon after, L'Oréal timely filed another notice of appeal, and Olaplex in turn timely filed another notice of cross-appeal. We have jurisdiction under 28 U.S.C. § 1295(a)(1).

II

Plaintiffs Liqwd and Olaplex LLC move to substitute Olaplex, Inc. for themselves under Federal Rule of Appellate Procedure 43, which "provides the procedural vehicle for a substitution of a new party for an existing one when authorized by law, whether the basis for substitution is a

party's death (Fed. R. App. P. 43(a)) or another reason (Fed. R. App. P. 43(b))." *'954 Appeal*, 2021 WL 280493, at *4. We approved this substitution based on the transfer of interest from plaintiffs to Olaplex, Inc. in the *'954 Appeal* and in the *Injunction Appeal*. *See '954 Appeal*, 2021 WL 280493, at *4; *Injunction Appeal*, 2021 WL 831031, at *3. We grant the motion here as well.

In its opening brief, L'Oréal argued that we should vacate the district court's judgment and remand for dismissal because, L'Oréal asserted, the judgment was entered after plaintiffs had transferred their interests to Olaplex, Inc., in January 2020 and without substitution of Olaplex, Inc. Appellant Opening Br. at 3–4. At oral argument, L'Oréal seems to have agreed that this argument does not survive our rulings in the *'954 Appeal* and the *Injunction Appeal*. *See* Oral Arg. at 1:00–1:19. Regardless, we reject the argument.

The transfer occurred after the district court's December 2019 order. That order, entered on the docket sheet, resolved all issues on the merits and left only ministerial calculations, so it was a final decision. *See Republic Nat. Gas Co. v. Oklahoma*, 334 U.S. 62, 68 (1948) ("[I]f nothing more than a ministerial act remains to be done, such as the entry of a judgment upon a mandate, the decree is regarded as concluding the case and is immediately reviewable."); *Meade Instruments Corp. v. Reddwarf Starware, LLC*, No. 1999-1517, 2000 WL 987268, at *3 (Fed. Cir. June 23, 2000); *U.S. S.E.C. v. Carrillo*, 325 F.3d 1268, 1272 (11th Cir. 2003) (per curiam); *Goodwin v. United States*, 67 F.3d 149, 151 (8th Cir. 1995); *see also Budinich v. Becton Dickinson & Co.*, 486 U.S. 196 (1988) (holding that merits ruling can be "final decision" even if attorney's fees issues remain). An appeal was permitted under 28 U.S.C. § 1295(a)(1) and Federal Rule of Appellate Procedure 4, whether because no separate document beyond the December 2019 order was required under Federal Rule of Civil Procedure 58 or because waiting for the separate document

(which was eventually entered in March 2020) is not required for a valid appeal (validity depending on finality). *See* Fed. R. App. P. 4(a)(7). We reject L'Oréal's jurisdictional objection because the transfer occurred after the district court rendered a final decision. We do not explore whether this is always a necessary condition to defeat a jurisdictional objection of the sort L'Oréal makes; we hold only that this condition is sufficient to defeat the objection.

L'Oréal in fact filed a notice of appeal within 30 days of the December 2019 order, *see* 28 U.S.C. § 2107; Fed. R. App. P. 4(a)(1)(A), and upon that filing, "our jurisdiction attached," *Injunction Appeal*, 2021 WL 831031, at \*3; *see also '954 Appeal*, 2021 WL 280493, at \*5 (citing *Gilda Indus., Inc. v. United States*, 511 F.3d 1348, 1350 (Fed. Cir. 2008)). L'Oréal, the loser of a monetary judgment, had standing to appeal. And there has been an Article III case or controversy throughout the appeal. L'Oréal seeks relief from the judgment against it. And the adverse interest of plaintiffs—or, now, the substituted Olaplex, Inc.—would exist in this court even if we saw a jurisdictional problem with the December 2019 order. Even on that assumption, the required remedy would be a remand for the district court to substitute Olaplex, Inc. and to re-enter the judgment, leaving the merits issues, and the stakes, unchanged. *See Finn v. American Fire & Casualty Co.*, 207 F.2d 113, 117 (5th Cir. 1953); *see also Caterpillar Inc. v. Lewis*, 519 U.S. 61, 71 & n.8 (1996) (seemingly describing *Finn* with approval).[1]

---

[1] We mention only L'Oréal's appeal because we dismiss plaintiffs' cross-appeal, which concerns non-patent damages, as moot given our reversal of non-patent liability.

III

A

We reverse the district court's denial of JMOL as to non-patent liability. Viewing the evidence in the light most favorable to Olaplex and giving "'the advantage of every fair and reasonable inference,'" we conclude that no reasonable jury could have found either trade-secret misappropriation or breach of contract. *Marra v. Philadelphia Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007) (quoting *Moyer v. United Dominion Indus., Inc.*, 473 F.3d 532, 545 n.8 (3d Cir. 2007)); *see also* Fed. R. Civ. P. 50.

Olaplex generally agrees that, if its trade-secret claim does not survive, neither does its breach-of-contract claim, because both claims focus on the same information, which was assertedly given to L'Oréal under the non-disclosure agreement during the mid-May 2015 contacts between the companies about a possible acquisition of Olaplex by L'Oréal. *See, e.g.*, J.A. 46091–96 (stating that the agreement involves "Confidential Information," which does not include, among other things, information that "is or becomes generally available to the public"). The only exception to this general proposition concerns differences not pertinent to our review of the case. *See* Cross-Appellant Opening Br. at 19–20 (asserting that for its breach-of-contract claim, Olaplex did not have to establish independent economic value or reasonable efforts to preserve secrecy); Oral Arg. at 31:14–31:50. We therefore discuss only trade-secret misappropriation—for which the parties agree Delaware law supplies the governing standards.[2]

---

[2]    Olaplex invoked the Delaware Uniform Trade Secret Act (DUTSA), codified at Del. Code. Ann. tit. 6, § 2001, *et. seq.*, and the federal Defend Trade Secret Act (DTSA), codified at 18 U.S.C. § 1836, *et seq.*, but no party suggests a difference in standards material to this case. We rely on

As the alleged trade-secret owner, Olaplex "bears the burden of proving both the existence and misappropriation of a trade secret." *Beard Research, Inc. v. Kates*, 8 A.3d 573, 590 (Del. Ch. 2010); *see also TLS Mgmt. & Mktg. Servs., LLC v. Rodríguez-Toledo*, 966 F.3d 46, 52 (1st Cir. 2020) (Dyk, J.) (A trade-secret plaintiff has "the burden of proof to establish the existence and scope of the alleged trade secret in the litigation."). "A trade secret is information that '[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and' . . . '[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy.'" *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 897 (Del. 2002) (quoting Del. Code. Ann. tit. 6, § 2001(4)); *see also* 18 U.S.C. § 1839(3)(A), (B) (nearly identical); *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 475 (1974) ("The subject of a trade secret must be secret, and must not be of public knowledge or of a general knowledge in the trade or business."). Misappropriation includes "[d]isclosure or use of a trade secret of another without express or implied consent" by certain persons, including the trade-secret owner. Del. Code. Ann. tit. 6, § 2001(2); 18 U.S.C. § 1839(5)(B) (same); *see also Beard Research*, 8 A.3d at 589.

Whether a trade secret exists is generally a question of fact. *See, e.g.*, *SmithKline Beecham Pharms. Co. v. Merck*

---

Delaware standards, while occasionally citing the federal statute. *See Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1311 n.13 (11th Cir. 2020) (treating Florida Uniform Trade Secrets Act and DTSA as consistent when there was no argument about differences); *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir. 2020) (same for California); *RGIS, LLC v. Gerdes*, 817 F. App'x 158, 162–63 (6th Cir. 2020) (same for Michigan).

& *Co.*, 766 A.2d 442, 448 (Del. 2000) ("Whether the trade secrets were generally known or readily ascertainable and whether Merck took reasonable precautions to protect their secrecy is a question of fact."). Misappropriation is generally a mixed question of law and fact. *See Total Care Physicians, P.A. v. O'Hara,* No. 99C-11-201, 2002 WL 31667901, at *4 (Del. Super. Ct. Oct. 29, 2002).

In presenting its case to the jury, Olaplex classified its asserted trade secrets in four groups: (1) information in an Olaplex "unpublished patent" application; (2) "business information"; (3) "testing and know how"; and (4) "dead ends and trials and errors." *See* Appellant Opening Br. at 22; Cross-Appellant Opening Br. at 18; *see also* J.A. 44623 (Tr. 696:7–18) (listing the four groups of information asserted to be a trade secret). As to each, we hold, the jury could not reasonably find sufficient proof of the elements of liability.

1

Olaplex contends that the trade secret in the unpublished patent application is only "using maleic acid during bleaching." *See* Cross-Appellant Opening Br. at 14 ("using maleic acid during bleaching"); *id.* at 21 ("Olaplex's trade secrets concern using maleic acid *during* bleaching."); *id.* at 22 n.7 ("The 'during vs. after' distinction matters because, in the 'after' setting, it is possible to have a low-pH treatment, and it was there that the prior art disclosed benefits of maleic acid for hair repair."); *id.* at 23 ("the use of maleic acid during bleaching"); *see also* J.A. 44624 (Tr. 697:11–13) ("Q. [D]o you see that this patent application describes a maleic acid based treatment in bleaching? A. That's correct."). The only reasonable finding the jury could make about this information, however, was that Olaplex did not disprove that the information was at least readily ascertainable at the time of the alleged misappropriation.

Olaplex presented little affirmative evidence supporting its assertion that using maleic acid during bleaching

was not readily ascertainable through proper means. Olaplex's expert Dr. Douglas Schoon testified as to the value of the information in the unpublished patent application but did not opine that particular information in the patent application was not readily ascertainable through proper means. *See* J.A. 44624–25 (Tr. 697:8–698:2) (describing the first group and its value). Dr. Schoon did testify that maleic acid was primarily thought of as a pH adjuster before Olaplex, J.A. 44637–38 (Tr. 710:24–711:3), but he did not testify that use of maleic acid during bleaching was neither generally known nor readily ascertainable. He acknowledged that, before the information exchange of May 19, 2015, L'Oréal was using maleic acid in a method of bleaching as a pH adjuster, J.A. 44668 (Tr. 741:11–13), and he never testified that the then-available public literature failed to disclose the alleged trade secret of using maleic acid during bleaching.

Olaplex also cites portions of testimony from another of its witnesses, Dr. Edward Borish. Cross-Appellant Opening Br. at 21–22 (citing J.A. 45564–65, 45569, 45573, 45582). But Dr. Borish testified only on the validity of the asserted claims of the '419 and '954 patents—not to trade secrecy. Consistent with that purpose, Dr. Borish testified that combinations of certain references did not prove that the asserted claims would have been obvious. At no point did Dr. Borish opine that "using maleic acid during bleaching" was not generally known or readily ascertainable through proper means. *See generally* J.A. 45564–98 (Tr. 1530–1564).

L'Oréal, in contrast, put forth numerous prior-art references along with expert testimony that the references disclosed the alleged trade secret before May 19, 2015, the start of the alleged misappropriation. Information in published patents or patent applications is readily ascertainable by proper means. *See, e.g.*, *ID Biomedical Corp. v. TM Techs., Inc.*, No. 13269, 1995 WL 130743, at *14 (Del. Ch. Mar. 16, 1995) (DUTSA) (Information in "patent

applications is readily ascertainable through appropriate means."); *Accent Packaging, Inc. v. Leggett & Platt, Inc.*, 707 F.3d 1318, 1329 (Fed. Cir. 2013) ("As a matter of law, any specifications and tolerances disclosed in or ascertainable from the asserted patents became publicly available in October 2005 when the '877 patent application was published and, as such, could not constitute a trade secret in early 2006 when Leggett is alleged to have engaged in misappropriation."); *Atl. Research Mktg. Systems, Inc. v. Troy*, 659 F.3d 1345, 1357 (Fed. Cir. 2011) ("A trade secret is secret. A patent is not. That which is disclosed in a patent cannot be a trade secret."); *On-Line Techs. v. Bodenseewerk Perkin-Elmer GMBH*, 386 F.3d 1133, 1141 (Fed. Cir. 2004) ("After a patent has issued, the information contained within it is ordinarily regarded as public and not subject to protection as a trade secret."); *see also, e.g.*, *Attia v. Google LLC*, 983 F.3d 420, 426 (9th Cir. 2020) (DTSA) ("[D]isclosure of a trade secret in a patent application extinguishes the information's trade secret status."); *BondPro Corp. v. Siemens Power Generation, Inc.*, 463 F.3d 702, 706 (7th Cir. 2006) ("Publication in a patent destroys the trade secret because patents are intended to be widely disclosed. . . ." (citations omitted)).

Ogawa (U.S. Patent No. 7,044,986) was first published on January 22, 2004, over 11 years before L'Oréal received the unpublished patent application in May 2015, and describes a composition used for bleaching (*i.e.*, lightening) or dyeing hair. Ogawa, col. 1, lines 5–10. The composition, explains Ogawa, includes "(A) ammonia or an ammonium salt, (B) a carbonate (other than an ammonium salt), (C) a transition metal salt, and (D) a chelating agent." *Id.*, Abstract; *see also id.*, col. 2, lines 1–14. For the chelating agent, the reference describes "maleic acid, and salts thereof," in a section of the specification disclosing "best modes for carrying out the invention," as an "[i]llustrative" "chelating agent." *Id.*, col. 2, lines 15–17; *id.*, col. 2, line 61, through col. 3, line 1; *see also id.*, col. 8, lines 34–39 (claim

8, listing "maleic acid or salts thereof"). Dr. Benny Freeman, L'Oréal's expert, testified that Ogawa described using maleic acid during bleaching. *See* J.A. 45209 (Tr. 1235:1–5) (Ogawa "talks about hair bleaches . . . and some of the compositions for those hair bleaches and maleic acid is one of the components that can be in these hair bleaches.").

The Patent Trial and Appeal Board has found that Ogawa discloses using maleic acid as an active agent during bleaching. *L'Oréal USA, Inc. v. Liqwd, Inc.*, No. PGR2017-00012, Paper 105 (P.T.A.B. July 13, 2018). We have held that the Board's finding was supported by substantial evidence. *'419 Appeal*, 941 F.3d at 1139. We see no basis in this case for the jury to find the contrary.

Moreover, Wahler (WO 2014/207097A1) was published on December 31, 2014, before the alleged misappropriation, and is titled "Cosmetic composition for lightening or dyeing the hair, comprising two basic agents, an acid and an oxidizing agent." Wahler discloses "a cosmetic composition for lightening or dyeing keratin fibres . . . comprising (a) one or more organic alkaline agents . . . , (b) one or more mineral alkaline agents, (c) one or more organic or mineral acids, (d) one or more fatty substances and (e) one or more oxidizing agents." Wahler, Abstract. "[M]ore preferentially," Wahler says, "maleic acid" (among other acids) is the acid for ingredient (c). *Id.*, page 9, line 33, through page 10, line 2. Dr. Freeman, L'Oréal's expert, testified that Wahler described using maleic acid during bleaching. *See* J.A. 45209–10 (Tr. 1235:21–1236:2) (Wahler "talks about cosmetic compositions for dyeing hair and it also includes what it calls a component C over there, an organic acid and maleic acid can be one of those organic acids that goes into the bleaching formulations.").

In addition, during the prosecution of what became the '419 patent, of which the '954 patent is a grandchild, Olaplex itself implicitly acknowledged that a prior-art reference called Mintel—"a database entry describing a Catzy

hair product"—disclosed using maleic acid during bleaching. *See* J.A. 14285–86. Indeed, while answering an anticipation rejection, Olaplex did not deny that Mintel taught claim elements requiring use of maleic acid during bleaching. Instead, Olaplex distinguished Mintel on other grounds: "Mintel, however, does not disclose the amount of any of the listed ingredients. Further, Mintel does not disclose or even suggest that the combination of the mixing cream and bleaching powder include at least 0.1% by weight of maleic acid." J.A. 14286.

We need not separately consider the arguments over L'Oréal's additional evidence concerning its own internal consideration of using maleic acid before it received the patent application from Olaplex in May 2015. Given the sparse affirmative evidence put forth by Olaplex and the competing evidence by L'Oréal, we determine that, even allowing for all reasonable inferences in Olaplex's favor, there is insufficient evidence in the record to support the jury's verdict that Olaplex met its burden to prove by a preponderance of evidence that "using maleic acid during bleaching" was a trade secret at the time of the alleged misappropriation.[3]

---

[3]    We do not suggest that the patent-law requirement of novelty must be met for information to constitute a trade secret. *See Kewanee*, 416 U.S. at 476 ("Novelty, in the patent law sense, is not required for a trade secret. Quite clearly discovery is something less than invention. However, some novelty will be required if merely because that which does not possess novelty is usually known; secrecy, in the context of trade secrets, thus implies at least minimal novelty." (cleaned up)). Rather, we determine that Olaplex failed to establish that "using maleic acid during bleaching" was not readily ascertainable, considering, among other things, the clear meaning of the prior-art references introduced into evidence.

2

As to "business information" and "financials," which we may assume contained trade-secret information, Olaplex claimed that L'Oréal misappropriated that information through improper use.  For such misappropriation, Olaplex had to prove that L'Oréal used the trade secret "without express or implied consent" from Olaplex.  Del. Code Ann. tit. 6, § 2001 ("[m]isappropriation" means "use of a trade secret of another without express or implied consent"); 18 U.S.C. § 1839(5)(B) ("misappropriation" means "use of a trade secret of another without express or implied consent").  We conclude that no reasonable jury could find that Olaplex so proved.

Olaplex asserts only that the business information "provided insight into whether it was more cost-effective for L'Oréal to acquire Olaplex or to launch L'Oréal's own products."  Cross-Appellant Opening Br. at 20.  In other words, Olaplex contends that L'Oréal misappropriated its trade secret of "business information" when L'Oréal used that information in its Build v. Buy analysis.  But the non-disclosure agreement, naturally given the purpose of the contacts between the companies at the time, explicitly gave L'Oréal authorization to use the information in that way.  *See* J.A. 46092 (Non-Disclosure Agreement) ("Restrictions on Disclosure and Use.  We will not disclose or permit our Representatives to disclose the Confidential Information to any person and will not use the Confidential Information for any purposes other than to evaluate, negotiate and, if applicable, consummate a possible Transaction . . . .").  Dean Christal, Olaplex's co-founder, himself testified that L'Oréal could use the information in a Build v. Buy analysis as well.  *See* J.A. 44351 (Tr. 472:16–23) ("Q. . . . Also, what about the confidential information that you might give them, were there any restrictions in the agreement about their ability to use that in certain ways?  A. No.  They could only, they could only use the confidential information that I gave them to evaluate the purchase of the company.

It couldn't be used for any other reason, just to look at it and crunch the numbers, I guess."); *see also* J.A. 46788–89. L'Oréal's use of the trade secret was not improper because Olaplex consented to that use. *See Texas Advanced Optoelectronic Solutions, Inc. v. Renesas Elecs. America, Inc.*, 895 F.3d 1304, 1314 (Fed. Cir. 2018) ("Although it is undisputed that Intersil used TAOS's information for the 'Build vs. Buy' analysis, that use was contractually permitted and therefore not a proper basis of liability for trade secret misappropriation."); *MPAY Inc. v. Erie Custom Computer Applications, Inc.*, 970 F.3d 1010, 1018 (8th Cir. 2020) ("And because Clayton's disclosure . . . was authorized, it did not amount to trade secrets misappropriation . . . .").

3

Two groups of alleged trade secrets remain: testing and know how, and dead ends and trials and errors. We conclude that no reasonable jury could have found that Olaplex met its burden of proving that this information was a trade secret before May 19, 2015, or that L'Oréal misappropriated the purported trade secrets.

a

A decisive deficiency in Olaplex's proof regarding these groups is the utter lack of proof that L'Oréal misappropriated anything secret within these groups. Olaplex asserted trade-secret misappropriation based only on improper use of the purported trade secrets, but Olaplex has not pointed us to any proof that L'Oréal improperly used the trade secrets in these two groups. Indeed, Olaplex describes these groups only at the high level of generality reflected in the labels we have quoted. It never identifies with specificity any particular information about testing, know-how, dead ends, or trial-and-error processes and evidence showing that L'Oréal made use of that information, let alone evidence of why that use was improper.

In its brief, Olaplex addresses this information in a single sentence, writing: "The 'testing and know how' and 'dead ends, and trials and errors' buckets yielded a 'dramatic change' in L'Oréal's maleic acid 'research after the May 19th Meeting.'" Cross-Appellant Opening Br. at 19–20 (quoting J.A. 44630). But the testimony Olaplex quotes does not support its assertion that L'Oréal misappropriated information on "testing and know how" or "dead ends and trials and errors" rather than the purported trade secret in the unpublished patent application. *See* Cross-Appellant Opening Br. at 20 (citing J.A. 44630 (Tr. 703)); J.A. 44630 (Tr. 703:3–13) ("Q. Okay. And what at a high level did you observe in terms of the testing of lab notebooks that you saw in L'Oréal's lab notebooks before the May 19th, 2015, meeting, and after that meeting? A. Well, I noticed there was a dramatic change in their research after the May 19th meeting. Q. Okay. What do you mean by that? A. Well, before the May 19th meeting, they were focused on other things than maleic acid and after the May 19th meeting, their research shifted to focus on maleic acid as an active ingredient in their prototypes.").

Although Olaplex at one point asked a question to Dr. Schoon specifically on the non-use of silicone in L'Oréal's products (which Olaplex argued was a trade secret), Dr. Schoon did not give an answer that made it into the record: When L'Oréal immediately objected to the question, Olaplex moved on without receiving an answer from Dr. Schoon. *See* J.A. 44626–27 (Tr. 699:15–700:14). Given that Olaplex had the burden, no reasonable jury could find that L'Oréal committed trade-secret misappropriation even when viewing the facts most favorably to Olaplex.

b

Olaplex's showing as to these two groups of alleged trade secrets—in its brief here, mentioned in a single sentence—is also insufficient to support the jury verdict in a second way. In part because of the absence of particularity,

we cannot say that the evidence allowed a reasonable finding that information in these groups was even a trade secret, *i.e.*, was not readily ascertainable through proper means by other persons who can obtain economic value from its disclosure or use. *See* Del. Code. Ann. tit. 6, § 2001(4); 18 U.S.C. § 1839(3)(B).

As to "testing and know how": Olaplex's expert, Dr. Schoon, testified that the asserted trade secret "would be the methods that Olaplex developed for evaluating their products," which included "sensory testing on tresses they obtained from . . . salons" and other testing to "establish the stability of their products." J.A. 44625 (Tr. 698:8–16). While Dr. Schoon admitted that L'Oréal was performing "sensorial testing on hair swatches before May 19, 2015," *i.e.*, when L'Oréal received the asserted trade secrets, J.A. 44668 (Tr. 741:14–17); *see also* J.A. 44670 (Tr. 743:4–7), he opined that the "testing methods" of Olaplex were "very unconventional methods," J.A. 44625 (Tr. 698:17–21). But Dr. Schoon did not identify what these methods were so as to provide any concrete basis for finding that they were not "readily ascertainable" by proper means—a proposition Dr. Schoon did not expressly assert or try to establish. A method that is infrequently used (*i.e.*, is unconventional) may well be readily ascertainable—or even generally known. Nor did Dr. Schoon testify to how the testing and know-how information differed from the methods disclosed in Trevor A. Evans & Kimun Park, *A Statistical Analysis of Hair Breakage*, 61 J. Cosm. Sci. 439 (2010), J.A. 51408–24—an article that, according to a co-inventor of the '954 patent, Dr. Craig Hawker, describes experiments that would have been well known to those in the industry at the time of the alleged misappropriation, J.A. 44300–01 (Tr. 421:19–422:1) ("Q. Do you believe – well, would you agree that the '419 patent doesn't describe any methodology related to repeated grooming; is that correct? A. We were aware of – you know, there's a famous paper from Evans in 2010 which describes repeated grooming experiments. And

for anyone kind of knowledgeable in the field, you know, that the kind of gold standard for repeated grooming experiments.").

As to "dead ends and trials and errors": Olaplex's expert, Dr. Schoon, testified that the asserted trade secrets "tell you where to go and where not to go. One example of a dead-end that Olaplex found was use of silicones. They claimed that the use of silicones in a product can destabilize the product and cause them to separate. So once they realized that, of course, they would formulate around that and not include silicones in their products." J.A. 44625–26 (Tr. 698:24–699:5). He further opined that information about dead ends would be "helpful" because it "prevent[s] wasting time and resources on following down pathways that were of a dead-end and be no value and waste a lot of time on dead-ends." J.A. 44626 (Tr. 699:6–11). According to Dr. Schoon, "the fact that silicone wasn't compatible with Olaplex" was not generally known. J.A. 44626 (Tr. 699:12–14). At no point did Dr. Schoon testify that the dead ends or trials and errors were not *readily ascertainable* by proper means.

Testimony from Mr. Christal, Olaplex's co-founder, does not provide the required evidence proving that the information was not readily ascertainable either. *See* Cross-Appellant Opening Br. at 18–19 (quoting J.A. 44370). Mr. Christal's testimony that the information was Olaplex's "playbook" does not support an inference that the information was not readily ascertainable by proper means. *See* J.A. 44370 (Tr. 491:9–14) ("Well, it was our playbook. It was everything. It was our chemistry. It was a roadmap of how to replicate, how to duplicate it, all of the other information we gave them."); J.A. 44370 (Tr. 491:20–23) ("When I say playbook, it was something that if it just fell into an alien's hands, they could have replicated our entire business in a very short period of time.").

Olaplex's lack of specificity in describing the "testing and know how" and "dead ends and trials and errors" information asserted to be trade secrets is telling on the issue of failure of proof of trade-secret status. In its brief, Olaplex did not specify what the trade secrets were besides using the labels "testing and know how" and "dead ends and trials and errors." *See generally* Cross-Appellant Opening Br. at 13–14, 18–20. As a result, L'Oréal, in its reply, had to speculate as to what contentions Olaplex was still pressing as to these groups; L'Oréal stated that the "only testing, know-how, dead-ends, and trials-and-errors that Olaplex identified to the jury were information orally conveyed to [one of L'Oréal's employees] regarding (1) sensory testing of marketed products on hair tresses; (2) product stability testing; and (3) non-use of silicones." Appellant Response and Reply Br. at 31 (citing J.A. 44625–27). On those subjects, as we have explained, Olaplex's proof was insufficient.

c

There is a "general requirement that '[a] person claiming rights in a trade secret bears the burden of defining the information for which protection is sought with sufficient definiteness to permit a court to apply the criteria for protection . . . and to determine the fact of an appropriation.'" *TLS Mgmt.*, 966 F.3d at 53 (alterations in original) (quoting Restatement (Third) of Unfair Competition § 39 cmt. d (Am. Law Inst. 1995)); *see also InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 658 n.1 (9th Cir. 2020) (noting that the particularity requirement has been applied in federal trade-secret cases). The Delaware courts have articulated the point in the context of discovery, with the logic of the requirement in that context carrying over to what is needed for a fair trial on liability. *See SmithKline*, 766 A.2d at 447 ("In cases involving trade secrets, the plaintiff is required to disclose, before obtaining discovery of confidential proprietary information of its adversary, the trade secrets it claims were misappropriated.

The plaintiff must disclose the allegedly misappropriated trade secrets with reasonable particularity." (citation omitted)).   In this case, the Verdict Form stated the requirement.   J.A. 37623 ("Has Olaplex proven that on May 19, 2015, it possessed *specific, identifiable* Trade Secret(s) . . . ?" (emphasis added)).   And at oral argument in this court, Olaplex acknowledged that there was a particularity requirement for its breach-of-contract claim, Oral Arg. at 31:51–32:17, and that it was not arguing for different treatment of that claim and its trade-secret claim, *id.* at 31:16–31:50.   *See also SL Montevideo Tech., Inc. v. Eaton Aerospace, LLC*, 491 F.3d 350, 354 (8th Cir. 2007) ("A claim that a confidentiality agreement was breached by disclosure of a proprietary combination of data should require the same precision of proof as a comparable trade secret claim.").

The requirement of reasonable particularity matters here because a trade secret "described in general terms . . . will usually be widely known" or readily ascertainable by proper means and thus "not a trade secret." *BondPro Corp.*, 463 F.3d at 710.   It matters, too, because, without particularity (pre-trial and at trial), there is an inadequate basis for a fair adjudication of what information was actually used by the defendants. *See, e.g.*, *InteliClear*, 978 F.3d at 658 ("Identifying trade secrets with sufficient particularity is important because defendants need concrete identification to prepare a rebuttal.   Courts and juries also require precision because, especially where a trade secrets claim involves a sophisticated and highly complex system, the district court or trier of fact will not have the requisite expertise to define what the plaintiff leaves abstract." (cleaned up)); *Givaudan Fragrances Corp. v. Krivda*, 639 F. App'x 840, 845 (3d Cir. 2016) ("It is patently obvious that trade secrets must be identified with enough specificity to put a defendant on notice of what is actually alleged to have been stolen.").   In both respects, as we have explained, we find insufficient proof of elements required for liability.   If the record contains more evidence than we have identified,

Olaplex has not brought such additional evidence to our attention, and we need not sift the extensive record for it on our own. *See Albrechtsen v. Bd. of Regents of Univ. of Wisconsin System*, 309 F.3d 433, 436 (7th Cir. 2002) ("Courts are entitled to assistance from counsel, and an invitation to search without guidance is no more useful than a litigant's request to a district court at the summary judgment stage to paw through the assembled discovery material. Judges are not like pigs, hunting for truffles buried in the record." (internal quotation marks omitted)); *IDX Systems Corp. v. Epic Systems Corp.*, 285 F.3d 581, 584 (7th Cir. 2002) (explaining in the trade-secret context that "a plaintiff must do more than just identify a kind of technology and then invite the court to hunt through the details in search of items meeting the statutory definition."); *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1266 (7th Cir. 1992) ("It is not enough to point to broad areas of technology and assert that something there must have been secret and misappropriated. The plaintiff must show concrete secrets.").

B

1

L'Oréal raises two issues regarding patent invalidity on appeal: first, whether no reasonable jury could find, as the jury here found, that the claims 14–16 of the '954 patent were not invalid based on the written-description requirement; second, whether the court's jury instruction on obviousness was legally erroneous. Appellant Opening Br. at 41–46; Appellant Response and Reply Br. at 47–51. We affirm the district court's denial of L'Oréal's JMOL motion on invalidity based on the written-description requirement and denial of L'Oréal new-trial motion on invalidity for obviousness. We hold that estoppel under 35 U.S.C. § 325(e)(2) bars L'Oréal from seeking to overturn the verdict on written description and obviousness because

L'Oréal reasonably could have raised these arguments during the post-grant review of the '954 patent.

a

At the outset, we reject L'Oréal's contention that, even if estoppel would apply here, we should not apply it because Olaplex raised the estoppel bar too late. *Olaplex, Inc. v. L'Oréal USA, Inc.*, No. 2020-1382, ECF No. 83 (Fed. Cir. Mar. 24, 2021) (L'Oréal Letter).

On July 30, 2019, the Board issued a confidential final decision involving the '954 patent. The trial in this case was less than a week away: It began on August 5, 2019. The jury reached a verdict one week later, rejecting the validity challenges (among its other rulings). At the end of August, the 30-day period for seeking rehearing as of right from the Board expired, 37 C.F.R. § 42.71(d)(2); on September 6, 2019, the Board's decision was made public; and on September 12, 2019, L'Oréal appealed from the decision, followed by Olaplex's cross-appeal. On December 16, 2019, as we have described, the district court in this case resolved post-trial motions, and appeal proceedings began soon after. After L'Oréal submitted its brief in this case challenging (among other things) the jury's verdict on validity, Olaplex responded on August 4, 2020. Briefing also proceeded in the appeal and cross-appeal from the Board's decision on the '954 patent, and we affirmed that decision on January 28, 2021. Six weeks later, on March 10, 2021—six days after we issued our opinion vacating and remanding for trial certain patent issues in the present case—Olaplex filed a letter asserting estoppel.

Olaplex could have raised the estoppel issue before it actually did, but we do not decide when precisely Olaplex should have raised it to avoid any timeliness question. We conclude, in the exercise of our discretion, that estoppel should be addressed in this case even if Olaplex raised it here later than it should have. *See, e.g., Singleton v. Wulff*, 428 U.S. 106, 121 (1976) ("The matter of what questions

may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases."); *Egenera, Inc. v. Cisco Systems, Inc.*, 972 F.3d 1367, 1378 n.6 (Fed. Cir. 2020) ("[W]hether to apply the waiver rule is discretionary."); *Barefoot Architect, Inc. v. Bunge*, 632 F.3d 822, 834–35 (3d Cir. 2011) (noting that the forfeiture rule "may be relaxed whenever the public interest so warrants" (internal quotation marks omitted)); *Tri-M Grp., LLC v. Sharp*, 638 F.3d 406, 416 (3d Cir. 2011).

The point in time at which the issue generally must be raised is not apparent on the face of the statute and has not been decided by this court. *See Progressive Cas. Ins. Co. v. Liberty Mut. Ins. Co.*, 625 F. App'x 552, 556 (Fed. Cir. 2015) ("§ 325(e)(1) does not say *when* a final decision begins to have estoppel effect (on the petitioner)."). Moreover, we concluded that under the pre-America Invents Act's estoppel provision for inter partes reexaminations, 35 U.S.C. § 315(c) (2012)—whose language is similar but not identical to § 325(e)(2)—estoppel rights arose when all appellate rights were exhausted. *See Bettcher Indus., Inc. v. Bunzl USA, Inc.*, 661 F.3d 629, 642–48 (Fed. Cir. 2011). Contrary to L'Oréal's suggestion, the timing issue was not decided by this court in *Network-1 Technologies, Inc. v. Hewlett-Packard Co.*, 981 F.3d 1015 (Fed. Cir. 2020), in which no dispute about untimeliness was presented. As relevant here, this court in *Network-1* held only that the estoppel provision of 35 U.S.C. § 315(e)(2), whose language is materially identical to that of § 325(e)(2), did not bar Hewlett-Packard from raising challenges in court where it could not have raised those challenges in the inter partes review it had joined, but not initiated, because joiners were limited to the issues raised by the initiating petitioner. 981 F.3d at 1026–28.

We have said that we "will disregard the rule of waiver in compelling circumstances, particularly if the issue has been fully briefed, if the issue is a matter of law or the

record is complete, if there will be no prejudice to any party, and if no purpose is served by remand." *Automated Merch. Systems, Inc. v. Lee*, 782 F.3d 1376, 1380 (Fed. Cir. 2015) (cleaned up); *see also*, *e.g.*, *Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*, 955 F.3d 1317, 1322–23 (Fed. Cir. 2020); *Icon Health & Fitness, Inc. v. Strava, Inc.*, 849 F.3d 1034, 1040–41 (Fed. Cir. 2017).  Here, the estoppel issue before us requires no additional factfinding.  *See*, *e.g.*, *Tri-M Grp.*, 638 F.3d at 418 ("[W]e have been reluctant to apply the waiver doctrine when only an issue of law is raised and no additional fact-finding is necessary." (internal quotation marks omitted)); *L.E.A. Dynatech, Inc. v. Allina*, 49 F.3d 1527, 1531 (Fed. Cir. 1995) (noting that a forfeited argument is more readily addressed if it presents "a pure question of law"); *Cemex, S.A. v. United States*, 133 F.3d 897, 902 (Fed. Cir. 1998).  And L'Oréal has not demonstrated any sandbagging by Olaplex or any concrete prejudice from any delay in Olaplex's raising the issue.  We therefore address estoppel.

b

Section 325(e)(2) provides:

> The petitioner in a post-grant review of a claim in a patent under this chapter that results in a final written decision under section 328(a), or the real party in interest or privy of the petitioner, may not assert either in a civil action arising in whole or in part under section 1338 of title 28 or in a proceeding before the International Trade Commission under section 337 of the Tariff Act of 1930 that the claim is invalid on any ground that the petitioner raised or reasonably could have raised during that post-grant review.

35 U.S.C. § 325(e)(2).  In an earlier decision, we affirmed the Board's final written decision determining that the '954 patent's breakage claims (including claims 14–16) "were not proved unpatentable," while claims 1–13, 19–23, and

29–30 of the '954 patent "were proved unpatentable." *'954 Appeal*, 2021 WL 280493, at \*1. We conclude that L'Oréal is estopped from pressing its challenges both to written description and obviousness in an effort to overturn the jury verdict.

As to written description, because L'Oréal sought a post-grant review, which is not limited to challenges based on prior art, it was able to challenge claims 14–16 for lack of written description. *See* 35 U.S.C. § 321(b). L'Oréal argues that estoppel does not apply because the district court issued a claim construction of the breakage requirements in claims 14–16 of the '954 patent after it filed its post-grant-review petition. L'Oréal Letter at 1. But L'Oréal here made no showing that its written-description argument was affected by the district court's claim construction. The possibility of different claim constructions is inherent in the two-forum problem that § 325(e) is addressing, and the possibility would hardly have been obscure to Congress. That possibility in and of itself cannot fairly provide an exception to the straightforward application of § 325(e)(2)'s language without significantly impairing the evident function of the language. Here, nothing prevented L'Oréal from raising the written-description challenge. *Cf. Network-1*, 981 F.3d at 1026–27; *Shaw Indus. Grp., Inc. v. Automated Creel Systems, Inc.*, 817 F.3d 1293, 1299–1300 (Fed. Cir. 2016).

As to obviousness, L'Oréal contends that estoppel does not apply to its obviousness challenge simply because it "relied on different prior-art combinations below." L'Oréal Letter at 1. Like the possibility of different claim constructions, the possibility of different prior-art references is inherent in the two-forum problem that is the subject of § 325(e), and it would hardly have been obscure to Congress. This possibility, the only basis of L'Oréal's argument against estoppel on the obviousness challenge, would not justify an exception to the provision without severely weakening the evident function of the provision by generally

allowing challengers, having lost on certain prior-art combinations before the Board, to press others in court. L'Oréal, which has not identified any basis for its challenge here that was unavailable at the time of its Board petition, could have reasonably raised in the post-grant review the prior-art combination it raised here.

2

On March 4, 2021, we decided an appeal from the district court's entry of a permanent injunction. *See Injunction Appeal*, 2021 WL 831031. That decision requires a vacatur of the infringement and damages verdict on patent infringement here, and a remand for a trial on infringement and damages. We do not address L'Oréal's challenges regarding damages.

We clarify one point from our prior decision. The parties have disagreed about what issues concerning L'Oréal's Step 3 products are available for Olaplex to press in the new trial. *Compare Olaplex, Inc. v. L'Oréal USA, Inc.*, No. 2020-1382, ECF No. 80 at 1 n.1 (Fed. Cir. Mar. 10, 2021) (Olaplex's Letter), *with id.*, ECF No. 84 at 1 (Fed. Cir. Mar. 24, 2021) (L'Oréal's Letter). The universe of possible scenarios of use available on this record, according to Olaplex itself, is limited. Within that universe, which confines further proceedings, our earlier opinion establishes that the only possibility remaining, as a substantive matter, would be in-salon use of Step 3 products in a single bleaching visit when only one, but not two, applications of the required active-agent formulation precedes use of Step 3 products. Whether discovery and other procedural constraints allow Olaplex now to press that possibility is a matter for the district court to decide.

IV

L'Oréal requests reassignment to a different district-court judge, making the request in one sentence, only under the "Conclusion" heading of its opening brief, not in the

Statement of Issues or the Argument section.  *See* Appellant Opening Br. at 67 ("Because of the systematic erroneous rulings, L'Oréal USA respectfully requests reassignment to a new district judge. *See Svindland v. The Nemours Found.*, 287 F. App'x 193, 195–96 (3d Cir. 2008).").  We follow Third Circuit law on reassignment requests. *See, e.g.*, *Cohesive Techs., Inc. v. Waters Corp.*, 543 F.3d 1351, 1375 (Fed. Cir. 2008) (noting that reassignment is governed under regional-circuit law).  We deny the request.

The request is forfeited as unsupported by a "developed argument." *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006); *Ethypharm S.A. France v. Abbott Labs.*, 707 F.3d 223, 231 n.13 (3d Cir. 2013).  In any event, the Third Circuit in *Svindland*, the only case L'Oréal cites, did not rest its reassignment order on "systematic erroneous rulings."  It relied on a record that "reveal[ed] numerous instances of . . . impatience and precipitous rulings" and "countless interruptions of counsel's arguments" by the district court, the precipitous rulings leaving key decisions wholly unexplained and therefore unreviewable.  287 F. App'x at 195–96.  L'Oréal has not shown this case to be like *Svindland*, and it has not even dealt with an extensive body of Third Circuit precedent that limits the circumstances in which the appeals court should order reassignment.

V

For the foregoing reasons, we grant the motion to substitute, reverse the denial of L'Oréal's JMOL motion as to trade-secret misappropriation and breach of contract, affirm the denial of L'Oréal's post-trial motions on patent invalidity, vacate and remand for a trial on patent infringement and damages, dismiss Olaplex's cross-appeal, and deny L'Oréal's request for reassignment.

The parties shall bear their own costs.

**REVERSED IN PART, AFFIRMED IN PART,
VACATED IN PART, DISMISSED IN PART, AND
REMANDED**